**In re Mark Steven MELLEMA and Laurie Ann Mellema, Debtors.**

**Bankruptcy No. 90–12892–SBB.**

United States Bankruptcy Court, D. Colorado.

Feb. 13, 1991.

George T. Carlson, Englewood, Colo., for debtors.

Monty Hogue, Denver, Colo., for General Motors Acceptance Corp.

Deborah Bowinski, Denver, Colo., for chapter 13 trustee.

## MEMORANDUM OPINION AND ORDER

SIDNEY B. BROOKS, Bankruptcy Judge.

THIS MATTER came before the Court for hearing on Debtors' Motion to Confirm Chapter 13 Plan and the Objections of the Standing Chapter 13 Trustee and General Motors Acceptance Corporation ("GMAC").[1] The Court, having reviewed the file, having held a hearing and being advised in the premises, enters the following findings of fact, conclusions of law and order.

## QUESTION PRESENTED

GMAC objects to confirmation of the Debtors' Chapter 13 Plan. GMAC claims it is not being paid on its secured claim the allowed amount of its claim and, thus, Debtors' Plan cannot be confirmed pursuant to Section 1325(a)(5)(B).[2] Central to this objection is GMAC's assertion that the interest, or capitalization, rate used by the Debtors to pay the full allowed amount of GMAC's claim, ten percent (10%), is inadequate; that fourteen percent (14%) interest is the correct and only sufficient interest rate.

---

1. The Standing Chapter 13 Trustee withdrew her Objection immediately prior to the hearing, as did several other secured creditors earlier.

2. Section 1325(a)(5)(B) of the Bankruptcy Code states as follows:

"(5) [W]ith respect to each allowed secured claim provided for by the plan—

. . . . .

GMAC argues that, in accord with the recent Tenth Circuit Court of Appeals decision in *In re Hardzog*, 901 F.2d 858 (10th Cir.1990), the proper "market rate" of interest the Debtors must pay is that rate of interest typically used in, and as generally reflected by, loans recently made by GMAC when financing sales of used motor vehicles in the region. Stated simply, the "market rate" of interest is, GMAC argues, the interest rate GMAC currently charges in the market in this region.

In opposition to that position, the Debtors maintain that, also in accord with *In re Hardzog*, the proper capitalization rate is the "market rate" of interest reflected by that rate of interest typically used in, and as generally reflected by the practice in, and recent history of, confirmed Chapter 13 plans in this region. Stated simply, the "market rate" of interest is, Debtors argue, the interest rate currently prevailing in the Bankruptcy Court in this region.

The question before the Court is, thus, in a Chapter 13 case what is the correct capitalization rate for debtors, or "market rate" of interest for creditors with claims secured by a motor vehicle in Chapter 13 cases?

## FINDINGS OF FACT

1. Debtors' Chapter 13 Plan provides that GMAC shall be paid the principal sum of $9,000.00, the agreed value of GMAC's collateral, a 1990 Chevrolet Lumina, plus interest at the rate of 10%. The original loan contract rate was 12.9%.

2. GMAC objected to confirmation of the Plan on the basis of an inadequate interest rate. GMAC's evidence reflects that, based on several hundred recent

---

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; . . ."

GMAC loans, the current average interest rate for new car sales financed by GMAC is 14% and the current average interest rate for used car sales financed by GMAC is approximately 15%. GMAC then asserted that, for purposes of this case, the 14% interest rate is representative of the "current market rate of interest used for similar loans in the region."

3. The Debtors presented evidence that in the month preceding the confirmation hearing on Debtors' Plan, November 1990, the five judges in the Bankruptcy Court in this District confirmed 141 Chapter 13 plans in pending Chapter 13 cases.[3] Pursuant to the terms of those confirmed plans, creditors of all types holding secured claims were paid the value of their collateral plus interest, on average, of 10.19% in those cases. Many of those creditors held a motor vehicle as collateral on their claim. Of those creditors who held a motor vehicle as collateral, they also were routinely paid, on average, about 10.2% interest. Thirteen GMAC allowed secured claims, or about 6% of the total allowed secured claims in the 141 confirmed plans, were paid using a rate of interest of about 10.1%.

## DISCUSSION

In reorganization cases, creditors with secured claims are entitled to receive property under the plan, equal to the full amount of their allowed claims.[4] If paid over time, creditors with secured claims must receive the "present value" of their claims.

> [S]ection 1325(a)(5) requires the bankruptcy court to assess interest on an allowed secured claim for the present value of the collateral in order to avoid dilution of the value of the claim through the delay in payment.

*U.S. v. Arnold,* 878 F.2d 925, 928 (6th Cir.1989).

The "present value concept" requires the Court to determine and approve a discount factor, or interest rate, to be paid by the debtor to the creditor. *In re Hardzog, supra* at 859. The interest rate is now, almost uniformly, agreed to properly be a "market rate" of interest and that standard has been expressly adopted by the Tenth Circuit Court of Appeals.[5] *In re Hardzog, supra* at 859; *U.S. v. Arnold, supra* at 928.

The key to accurately fixing the correct market rate of interest in this circumstance is found by properly interpreting *In re Hardzog, supra.*[6] This Court derives three principal and controlling conclusions from *In re Hardzog.*

1. The "current" market rate of interest is the standard by which a discount, or interest rate, is determined in

---

3. The evidence presented by the Debtors was a compilation and summary of the qualifying Bankruptcy Court files as prepared and presented by the Debtors to the Court and to which GMAC stipulated. The substantial majority of loan rates were right at 10% with the balance ranging from 8% to 12%. The creditors consisted primarily of major lenders such as GMAC, Sears, ITT Financial, Montgomery Ward, Ford Motor Credit, Beneficial, AVCO, Citicorp, Nissan, and the Internal Revenue Service, with a few smaller lenders such as Bell Plumbing, CMB Auto Sales, and Lee's Used Cars.

4. Full recognition to the distinction between secured and unsecured claims—or undersecured claims—must, of course, be made. 11 U.S.C. § 506.

5. The Tenth Circuit Court of Appeals eschews most all alternative methods for fixing the interest rate:

> "A review of court decisions determining an appropriate interest rate under Chapter 12 likewise reveals diverse results which include using the interest rate charged·by the secured creditor; [footnote omitted] using the legal rate on judgments in the absence of evidence concerning market rates; [footnote omitted] using the contract rate after determining it was below market; [footnote omitted] and of course the case now before this court, which holds a cost of funds approach to be proper." *In re Hardzog, supra* at 860.

6. This Court certainly concurs in the observation of the Tenth Circuit Court of Appeals that: "Courts are not well situated to craft and determine interest rates. Judges are neither bankers nor lenders and do not have the expertise to set interest rates." *In re Hardzog, supra* at 860. This Court is not, however, quite as confident as is the Court of Appeals that: "[C]ourts are well equipped to determine market rates." *In re Hardzog, supra* at 860. The within case illustrates the point.

a plan of reorganization and a Chapter 13 plan of debt adjustment.

2. Determination of the correct, applicable "current" market rate of interest is to be based on evidence of "similar loans in the region." [7]

3. Only in "special circumstances" may the interest rate used in a plan of reorganization vary from the "current" market rate of interest. The term "special circumstances" is undefined, except that it may include the situation where "the market rate [is] higher than the contract rate," as here.[8]

In *Hardzog*, the Tenth Circuit recognizes that a myriad of factors go into establishing current market rates of interest and, it is assumed, that "a new loan" reflects those various factors.[9] It is further assumed that new loans, which reflect the market rate, may be similar, or comparable, to those made in a bankruptcy situation. Stated another way, the *Hardzog* opinion recognizes that the market rate of interest is largely determined by lenders in the marketplace and it then presumes that the borrowers to whom those lenders are making loans are persons who may be "similarly" situated to persons in bankruptcy. This may, indeed, be partly true, but the conclusion presents an anomaly. New loans in the marketplace are not, typically, made to bankruptcy debtors; new loans are not made, generally, or customarily, in bankruptcy situations.[10] Thus, realistically, the current market rate of interest used for "similar loans in the region" can only

be a guide for fixing a discount, or interest rate in bankruptcy cases, not an absolute that can be confidently determined with certainty and precision. Notwithstanding this anomaly, the Tenth Circuit has nonetheless given a defined and workable standard from which to determine appropriate interest rates.

■ The standard, or the controlling conclusion and rule, in *In re Hardzog* thus can be stated as follows:

> [I]n the absence of special circumstances, such as the market rate being higher than the contract rate, bankruptcy court should use the current rate of interest on like-type loans and, when a dispute arises, the market rate should be easily susceptible of determination by means of a hearing where each party is given the opportunity to submit evidence concerning the current market rate of interest for similar loans in the region.

*In re Hardzog, supra* at 860 (emphasis added).

To better understand the reasoning and policy established in *Hardzog*, and thus properly interpret *Hardzog*, a look at *U.S. v. Arnold, supra* and its Chapter 13 predecessors, *In re Colegrove*, 771 F.2d 119 (6th Cir.1985) and *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427 (6th Cir.1982), is useful. The Tenth Circuit appears to have adopted the principle found in *U.S. v. Arnold, supra:*

> [I]n the absence of special circumstances bankruptcy courts should use the current

---

7. "Similar loans in the region" and "like-type" loans are terms used synonymously by the Tenth Circuit Court of Appeals.

8. The Tenth Circuit purposely avoided defining or describing "special circumstances," until the issue was ripe and properly presented:
   "We deliberately reserve until the issue is properly before us, a definition of the parameters of "such special circumstances."
   *In re Hardzog, supra* at 860.

9. The Tenth Circuit set forth the following factors lenders may utilize in establishing interest rates:
   "A lender, in establishing interest rates to be charged to a borrower, will consider and utilize many factors, including what the competi-

tion charges, its cost of funds, the condition of the local economy, its overhead, the character of the borrower, the capacity of the borrower to repay, the value of the collateral, the costs of servicing the loan, the status of the lender's loan portfolio, the lender's ratio of loans to assets, its liquidity, and a host of other factors."
*In re Hardzog, supra* at 860.

10. Conventional wisdom is that credit is not available, or generally not available, to bankruptcy debtors, while in bankruptcy or shortly thereafter. By contrast, it is often argued that a bankruptcy debtor, discharged of existing debt, is a better credit risk than many and thus can more easily obtain, and often does obtain, extensions of credit.

market rate of interest used for similar loans in the region.

*U.S. v. Arnold, supra* at 929.

In *U.S. v. Arnold,* the Sixth Circuit distinguished between two predecessor cases, *In re Colegrove* and *Memphis Bank & Trust Co. v. Whitman.* In *Colegrove,* a Chapter 13 debtor was allowed to pay a real property mortgage arrearage to its "completely secured" creditor with interest computed at the prevailing market rate "with a *maximum limitation* on such rate to be the underlying contract rate of interest." *U.S. v. Arnold, supra* at 929 (emphasis in original). The court reasoned that, in the absence of a cramdown situation where an undersecured creditor is forced to accept a write-down of its loan, a fully secured creditor should not be entitled to a new, higher market rate of interest if the prevailing market rate exceeded the contract rate. It would constitute a "windfall" to the creditor to the detriment of the debtor. Thus, a limit on the interest factor was imposed as fixed by the terms of the contract.

In *Memphis Bank and Trust Co. v. Whitman,* a Chapter 13 debtor was allowed to write down a creditor's $9,799.00 claim and effect a cramdown on an undersecured creditor holding debtor's automobile, valued at $4,800.00, as collateral. The debtor was required, however, to pay an interest, or discount, rate on the allowed amount of the claim, $4,800.00, at prevailing market rates. There was no limit placed on the interest factor, no interest rate ceiling imposed by the contract. The court reasoned that the debtor should pay the full market rate of interest, not the lesser contract rate, because a creditor subject to a write-down on its loan was, in effect, making "new loan" in an amount equal to the value of the collateral.

> Because we viewed [in *Memphis Bank and Trust Co. v. Whitman* ] the 'cramdown' provision of section 1325(a)(5)(B) as forcing the creditor to make a new loan in the amount of the current value of the collateral, we found the creditor entitled to the current market rate for similar loans at the time the loan was made.

*U.S. v. Arnold, supra* at 929.

In *U.S. v. Arnold,* the Court of Appeals followed *Memphis Bank and Trust Co. v. Whitman* and allowed a Chapter 12 debtor to write-down an undersecured creditor's claim, but required the debtor to pay an interest rate on the allowed claim equal to the prevailing market rate of interest. Again, the theory and distinguishing feature which imposed on the debtor the obligation to pay the prevailing market rate on the allowed claim, with no contract cap, was the "new loan concept" and a creditor's entitlement "to the current market rate for similar loans at the time the loan was made." *U.S. v. Arnold, supra* at 929.

■ Thus, the Sixth Circuit precedents, followed in *Hardzog,* appear to conclude that where a cramdown is effected in a plan of reorganization, the creditor is entitled to the prevailing market rate of interest on its allowed claim.

> [W]here creditors are forced to accept a 'cramdown' ... [they] are entitled to current market rates of interest with respect to the new loan.

*U.S. v. Arnold, supra* at 929.

Where a creditor is fully secured and is not subject to a cramdown, that creditor is entitled only to its original contract rate of interest, not the higher market rate of interest which would, if granted, constitute a windfall to the creditor.

■ In applying the principles of these cases to the within facts, while following the express holding in *Hardzog,* this Court comes to two conclusions:

(1) The prevailing market rate of interest used for similar loans in the region must, generally, be applied in Chapter 13 cases where the debtor seeks to write-down—or cramdown—an undersecured creditor's claim. The prevailing market rate of interest for similar loans in the region is best exemplified by GMAC's loans recently made in the marketplace in this region.

(2) Special circumstances, such as here where the prevailing market rate of interest exceeds the creditor's contract rate of interest, allows—but does not require—use of the lesser contract rate of interest in a Chapter 13 plan so

as to avoid a windfall benefit to the creditor.[11]

This Court adopts as controlling the conclusions set forth above. In this case, the Debtors must pay an interest rate equal to the contract rate, 12.9%, on the creditor's allowed secured claim. Absent the special circumstances in this case (i.e., the 14% to 15% market rate being higher than the 12.9% contract rate), the Debtors would be required to pay the "market rate" of interest best demonstrated by GMAC's evidence of prevailing interest rates on similar loans in the region, 14%.

IT IS THEREFORE ORDERED that, for the reasons set forth above, the Debtors' Motion to Confirm is DENIED.

IT IS FURTHER ORDERED that Debtors may, on or before February 27, 1991, file an Amended Plan and Motion to Confirm, a motion to convert, or other appropriate pleading. Failure to file such a pleading shall result in the entry of an Order dismissing the within Chapter 13 case, without further notice or hearing.

---

**11.** This Court is cognizant that these conclusions do not strictly comport with the holdings of the referenced Sixth Circuit cases. These conclusions do, however, conform to the principles in those opinions and still gives full effect to the explicit language in *Hardzog:* "[I]n the absence of special circumstances, such as the market rate being higher than the contract rate ... Courts should use the current market rate of interest...." *In re Hardzog, supra* at 860 (emphasis added).